IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 3, 2015

**CHANCY JONES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 09-02131     W. Mark Ward, Judge**

**No. W2014-02516-CCA-R3-PC  -  Filed December 29, 2015**

The petitioner, Chancy Jones, appeals the denial of his petition for post-conviction relief from his second degree murder conviction, arguing that he received the ineffective assistance of counsel. After review, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Chancy Jones.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTS

The petitioner was charged with first degree murder and employing a firearm during the commission of a felony after he shot his paramour who informed him that she was pregnant and a dispute arose between them. Following a trial, the jury convicted the petitioner of second degree murder and acquitted him on the employment of a firearm charge. He was sentenced to twenty-four years in incarceration. The petitioner appealed, and this court affirmed the judgments of the trial court. The Tennessee Supreme Court denied his application for permission to appeal.

This court recited the underlying facts of the case on direct appeal as follows:

The State's proof established that in the early morning hours of September 9, 2008, a female was found dead inside a blue Chevrolet Impala at a Shell gas station located at 1709 Whitten Road in Memphis. Police officers who responded to the scene testified that the victim appeared to have sustained three gunshot wounds. After finding the victim's purse, officers tentatively identified her as Phyllis Malone. This identification was later confirmed through fingerprint analysis. Police officers did not find a weapon or shell casings at the scene. Neither did they find the victim's cell phone. Lieutenant Barry Hanks[1] of the Memphis Police Department ("MPD") testified that inside the victim's purse he found a three-page handwritten letter addressed to someone named "Chancy." Lieutenant Hanks said that the letter was unsigned, undated, and he could not tell whether it had been mailed. The letter indicated that the victim had been to a doctor and was pregnant.

Lieutenant Walter Davidson, MPD, notified the victim's next of kin. He went to the home of Ophelia Harris, one of the victim's sisters. Lieutenant Davidson asked the victim's family whether they knew someone named "Chancy." Harris told him that the victim had been dating an "Officer Jones," but she apparently did not know Officer Jones' first name. Later that same day, Harris told Lieutenant Davidson that she had spoken with her neighbor, who was also a police officer, and that the neighbor had told her that he knew a police officer named Chancy Jones.

MPD Officer Chancy Jones ("the [petitioner]") reported to duty on September 9, 2008, for his regular shift at 2:00 p.m. He was a patrolman and spent the early part of his shift responding to calls. Lieutenant Davidson and Deputy Director Toney Armstrong, then commander of the MPD's Homicide Bureau, went to the [petitioner]'s precinct to question him about the victim's death. Deputy Director Armstrong asked the [petitioner] whether he knew Phyllis Malone, and the [petitioner] replied that he knew someone named "Phyllis Walker." Lieutenant Davidson testified that from his conversations with the victim's sisters, he knew the victim sometimes called herself Phyllis Walker.[2] The [petitioner] was relieved of duty and taken to the homicide office for questioning. Deputy

[1] Lieutenant Hanks was a sergeant with the homicide bureau at the time of the offense.

[2] Cynthia Brown, a sister of the victim, testified that the victim sometimes used different last names, including Walker, Harris, and Malone. Walker was apparently the last name of one of the victim's former boyfriends.

Director Armstrong informed the [petitioner] that he was a suspect in a homicide investigation, advised him of his Miranda rights, and the [petitioner] signed an advice of rights form. The [petitioner] indicated that, as a police officer, he was aware of his rights, and he did not request an attorney.

Deputy Director Armstrong and Lieutenant Davidson then questioned the [petitioner]. The [petitioner] told them that he met the victim at an apartment complex while he was responding to a call. According to the [petitioner], the two exchanged phone numbers, and while the relationship was initially just friendly, it developed into a sexual one. He told the officers that the sexual relationship extended only to oral sex, not intercourse. The [petitioner] said that the last time he spoke with the victim was the night before her death, but he told the officers that he could not recall what they spoke about. According to Deputy Director Armstrong, the [petitioner] then began to give vague answers. The [petitioner] initially denied knowledge about the victim's homicide. However, when Deputy Director Armstrong told the [petitioner] that he did not believe he was being truthful, the [petitioner] subsequently admitted responsibility for the victim's death.

According to Deputy Director Armstrong's testimony at trial, the [petitioner] told him that the victim had informed the [petitioner] that she was pregnant and wanted money for an abortion or else she would tell the [petitioner]'s wife.[3] The [petitioner] told the officers that he met with the victim at the gas station on Whitten Road and that they had gotten into an argument over whether he would pay for an abortion. The [petitioner] told the officers that the victim became angry and threatened to tell his wife, and at that point, he shot her.

After this initial police interview, the [petitioner] provided a formal, written statement. The written statement was admitted as an exhibit at trial and, in pertinent part, provides as follows:

Q: Are you the person responsible for the death of Phyllis Malone?

A: Yes.

. . . .

---

[3] The [petitioner] testified that he was separated from his wife at the time of his relationship with the victim.

3

Q: On Monday, September 8, 2008, did you have a conversation with Phyllis earlier in the evening?

A: Yes.

Q: Describe the content of that conversation.

A: She had said she wanted to meet with me when I got off and I told her I didn't know what time I was gonna get off [be]cause I was downtown at 201 [Poplar]. She had called and I told her I would call her back on the time frame or when I got off because I didn't know what time I would be getting off.

. . . .

Q: Later in the evening, did you meet with Phyllis?

A: Yes.

Q: Where and when did you meet Phyllis?

A: At Shell gas station on Whitten Road.

. . . .

Q: What time did you meet her?

A: Maybe around 11:00 p.m.

Q: In your own words, tell me the events that occurred before, during, and after this incident occurred.

A: We met there. We had a conversation about her having the abortion done and also she kept questioning if I was going to pay for the baby's insurance. She got upset when I answered the question I was going to think about it. She became irate, cursing, threatening, and blackmailing saying that she was going to tell my wife and take me to child support and I had to pay the white man at juvenile court. I talked to her and she calmed down and she wanted a hug or what not. After that, the conversation picked back up. She asked me the same question again and I told her I

4

would think about it.  Then she said "Well I'll just go and tell the wife" and said all I was gonna pay for.  She said "You'll pay in the long run."  After that, she got in her car.  She started fussing again.  She said "Well I'll just see you at your house tomorrow."  I asked her why would she do that.  She said since I didn't have an answer for her, that's what she was gonna do.  So when I asked her about going to get the abortion done, she cursed and said hell n[o] she wasn't gonna do that.  She was determined that she was going to tell her and come to my house.  I asked her not to do it.  She said "Bye Chancy."  That's when I pulled out a pistol and I shot her.

Q: How many times did you shoot her?

A: Two or three times.

Q: Where were you when you fired the shots?

A: Standing outside of her car on the passenger side.

. . . .

Q: What type and caliber weapon did you use?

A: .38 Rossi revolver that I kept in the truck.

Q: Where is the .38 now?

A: Thrown in the river.

Q: Did you take anything from the victim's car or person?

A: Cell phone.

Q: Why did you take her cell phone?

A: [Be]cause I knew she had been calling and texting me.

Q: What did you do with the cell phone that you took from Phyllis?

A: Threw it in the river.

MPD Sergeant James Max searched the [petitioner]'s patrol car.  He

5

found only work-related items and did not find any evidence related to the shooting. Likewise, police officers searched the [petitioner]'s home and personal vehicles. While officers found multiple guns and ammunition in these locations, they did not find a .38 caliber weapon, ammunition, or holster. Neither did they find the victim's cell phone or other evidence related to the shooting. Officers did not attempt to retrieve the gun used in the shooting or the victim's cell phone from the river where the [petitioner] claimed to have disposed of them.

Three of the victim's sisters testified regarding interactions they witnessed between the victim and the [petitioner]. One of the victim's sisters, Samantha Malone, testified that the victim lived with her. Samantha[4] testified that she last saw the victim on the night of her death at approximately 9:45 p.m. She said that the victim was in a "good mood," but the victim did not tell her that she was going to meet the [petitioner].

Cassandra Malone, another sister of the victim, testified that she heard the victim talking with the [petitioner] over the telephone using a speaker-phone two or three times. About three or four weeks prior to the victim's death, Cassandra heard the victim tell the [petitioner] that if he wanted to keep the baby, she would have it, but that if he did not, she would need money to pay for an abortion. In a statement to police, Cassandra told them that she did not believe the victim was pregnant because the victim had told Cassandra that her "tubes were tied."

The victim's sister, Cynthia Brown, testified that she heard the victim on the phone with a person whom the victim identified as "Mr. Jones." Brown testified that the first such occasion occurred approximately one month before the victim's death.[5] She said that she overheard the phone call because the victim had put it on speaker-phone. In this phone conversation, the victim told "Mr. Jones" that she needed money for an abortion. According to Brown, when the victim told "Mr. Jones" that if she did not get money she would tell his wife, "Mr. Jones" responded, "Don't play with my family" and hung up the telephone.

---

[4] A number of the witnesses share the same last name. Where necessary for clarity, we will sometimes refer to these witnesses by their first names only. We intend no disrespect.

[5] In an earlier statement to police, Brown said that this phone call was approximately one week before the victim's death. On cross-examination, she stated that she did not recall the exact day of the phone call.

Brown testified that she last saw the victim at around 11:00 p.m. on the night of her death. The victim was driving Brown to work in a blue Chevrolet Impala. Brown testified that the victim was "dressed up," had just "had her hair done," and was in a "good mood." According to Brown, at approximately 10:50 p.m., the victim received a call from "Mr. Jones." This phone call was not on speaker-phone, and Brown could only hear the victim's side of the conversation. Brown heard the victim tell "Mr. Jones" that if he did not give her money for an abortion she would tell his wife. Brown testified that she did not think the victim was pregnant because "she had her tubes tied," but Brown did not ask the victim whether she was actually pregnant. Brown said that the victim dropped her off at work at approximately 11:00 p.m. and that the victim told "Mr. Jones" that she would meet him at 11:20 p.m.

The [petitioner]'s cell phone records were admitted into evidence. These records showed that the [petitioner] received calls from a phone number identified as the victim's at 9:13 p.m., 9:53 p.m., 10:46 p.m., and 11:33 p.m. on September 8, 2008. An engineer employed by the [petitioner]'s cell phone company testified that he analyzed which cell towers were used to make these phone calls. By determining which cell towers were utilized by the [petitioner]'s and victim's cell phones, he could determine the location of the [petitioner]'s cell phone at the time of the call. He testified that at the time of the final phone call at 11:33 p.m., the [petitioner]'s cell phone was located at 1709 Whitten Road, the address of the Shell gas station where the victim's body was found.

Dr. Lisa Funte, a medical examiner at the Shelby County Regional Forensics Center, testified as an expert in forensic pathology. She testified that the victim's cause of death was multiple gunshot wounds. According to Dr. Funte, one bullet entered the right side of the victim's head, a second bullet entered the right side of the victim's chest, and a third bullet also entered the victim's chest. Dr. Funte opined that the head wound and one of the chest wounds would have each been fatal, but that the other chest wound would not have been fatal. She could not determine the order of the gunshot wounds. Based on her analysis of the gunshot wounds, Dr. Funte surmised that the two gunshots to the victim's chest were probably fired from a few feet away. Dr. Funte was unable to make such a determination regarding the head wound because the victim's hair blocked the deposition of soot and gunshot residue necessary for her analysis.

Officer Anthony Mullins, a homicide investigator with the MPD, testified regarding blood stains found in the victim's vehicle. Officer Mullins explained that the blood splatter in the passenger seat of the victim's vehicle indicated to him that the seat was not occupied at the time the victim was shot. Officer Mullins surmised that the shooter was standing outside of the vehicle and shooting through a rolled-down front passenger-seat window. He confirmed that there were no bullet holes in the windshield or passenger-side window, which indicated to him that the passenger-side window was open during the shooting. Officer Mullins did not observe the vehicle itself, but instead based his testimony on observation of crime scene photos.

The defense's proof consisted of the [petitioner]'s own testimony. He acknowledged causing the victim's death and gave the following recitation of events leading to her death. The [petitioner] met the victim in July 2008 while on patrol, and they exchanged phone numbers. They began a sexual relationship that was limited to him receiving oral sex. However, soon, the victim told the [petitioner] that she was pregnant and needed money for an abortion. When he questioned her pregnancy because they had not had sexual intercourse, she told him that she had kept his sperm in her mouth following oral sex and had taken it to a doctor and been artificially inseminated. The [petitioner] said that the victim was threatening him and his family by telling him that if he did not give her money she would tell his wife about their affair.

On September 8, 2008, the [petitioner] agreed to meet the victim at her request. They arranged to meet after his patrol shift ended at approximately 11:00 p.m. The [petitioner] said that the victim arranged the meeting location and that he had never met her at the Shell gas station before. He arrived before she did, and when she arrived, she parked beside his truck. The [petitioner] said that he got out of his truck and approached the victim who was in her car. The [petitioner] had a .38 revolver in his pocket, but he testified that its presence was unrelated to their meeting. He explained that he had left his service weapon in his locker at the precinct. When he was off-duty he carried a .38 revolver for personal protection, which he usually left in his personal vehicle during his shift. As was his habit, when he left work he put the .38 revolver in his pocket.

The [petitioner] said that the victim initially remained in her car but eventually got out. They talked for approximately one hour. According to the [petitioner], the victim was asking him for money for the baby's

insurance and telling him that she was not going to have an abortion. He testified that, "I told her I would think about it. And at that point, she became irate, loud, threatening, and blackmailing me, saying about I would pay in the long run, if you don't do this, if you don't give me this, that I would pay." When asked by defense counsel to clarify, the [petitioner] said that:

> She threatened to do harm to me and she threatened to do harm to my family. She said that you don't know me. You don't know what I would do and she threatened to harm me. She said that I would run over you. She said – well, her words were, I will run over your ass if you don't do what I ask you to do.

The [petitioner] then described the circumstances leading to the shooting:

> Well, eventually, she got back in her car. About the time the conversation was over with, she had got back in her car, fastened her seatbelt, and the car was running, and as I got ready to leave, I walked from in front of her on the passenger's – her driver's side, and I walked in front of her car going to my vehicle, about the time I got almost clear of her vehicle, she revved up her engine and she had already told me she was going to run over me, she revved up her engine. I reacted, I took two steps and I pulled my weapon and I fired.

The [petitioner] fired "a couple of times" through the passenger-side window without taking aim. He said that he "fired in reaction," and his "instincts just took over." According to the [petitioner], he believed that the victim would run over him with her vehicle, and he feared for his life. The [petitioner] said that when the victim revved her engine, he "jumped to clear her vehicle, took two steps, came out of my pocket and I fired." After shooting the victim, the [petitioner] reached into her car, took the keys out of the ignition, and dropped them onto the floorboard. He also took her cell phone and left. When asked why he did not call an ambulance or the police, he replied that he "panicked." He said that he rode around for a while before throwing the gun and cell phone into the river. He then went back to his house and "[d]azed around the house in shock." He said that he reported to work the next day but was simply "going through the motions."

9

The [petitioner] maintained that, when he was arrested and interviewed by Deputy Director Armstrong and Lieutenant Davidson, he told them that the victim threatened to run him over with her car. He testified that when his written statement was taken, the police did not ask him about the victim's threats. The [petitioner] explained that this was the reason his written statement did not portray that he acted in self-defense. The [petitioner] acknowledged that the questions and answers reflected in the written statement were accurate. However, he asserted that, when giving the written statement, he had not been asked to clarify what he meant when he said that the victim had been "irate, cursing, threatening, and blackmailing." Lieutenant Davidson testified that, although he understood each of these words to mean different things, he understood them each to refer to the victim threatening to tell the [petitioner]'s wife about the extra-marital relationship, not physical harm. Deputy Director Armstrong testified that the [petitioner] never told him that he was afraid of physical harm from the victim.

The [petitioner] sought to introduce evidence that the victim had committed prior acts of violence. Specifically, the [petitioner] sought to introduce the victim's conviction for aggravated assault in 2002 and certain orders of protection that had been sought and entered against the victim by persons unrelated to this case. The [petitioner] argued that this evidence supported his claim of self-defense as corroboration that the victim acted as the first aggressor. The trial court admitted the aggravated assault conviction through the stipulation of the parties. However, regarding the orders of protection, the trial court determined that the orders themselves were not relevant to specific instances of violence by the victim. The court reasoned that the protective orders could have been entered for some reason other than a violent act committed by the victim, and that without the underlying factual basis supporting the entrance of the orders, the orders were not relevant. Rather than admitting the orders of protection themselves, the trial court stated that it would permit the [petitioner] to establish the factual basis for the orders of protection through the testimony of the persons who had obtained the protective orders against the victim. However, the [petitioner] was unable to procure these witnesses' testimony.

State v. Chancy Jones, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *1-6 (Tenn. Crim. App. Apr. 5, 2012), perm. app. denied (Tenn. Aug. 16, 2012).

On August 8, 2013, the petitioner filed, through counsel, a petition for post-conviction relief. In his petition, he raised various allegations of ineffective assistance of

counsel, including the one raised on appeal that counsel was ineffective for failing to call Ida Johnican to testify at trial.

At the evidentiary hearing, the petitioner testified that he was represented by counsel at trial. He was indicted for first degree murder but was ultimately convicted of second degree murder. The petitioner and counsel met a number of times before trial, but the petitioner could not recall the exact number. He was not in custody pending trial, so they met at counsel's office. The petitioner did not recall reviewing discovery materials with counsel. The petitioner said that he felt comfortable with counsel and that they were able to communicate well. He thought counsel was doing a "good job" until certain things came up at trial to which counsel did not object. The petitioner told counsel to call Ida Johnican and Michael Beach to testify at trial because they had filed orders of protection against the victim. However, counsel did not call them.

On cross-examination, the petitioner acknowledged that he and counsel discussed the facts and circumstances of his case during their meetings in counsel's office. They discussed potential witnesses, including Ida Johnican and Michael Beach. The petitioner wanted the witnesses to testify to the substance of the orders of protection those individuals had sought against the victim. At trial, counsel asked the trial court to admit the orders of protection. However, after a jury-out hearing, the court ruled that the orders of protection were not relevant without the testimonies of Ms. Johnican and Mr. Beach. The witnesses were not available to testify because they had not been subpoenaed.

Trial counsel testified that he represented the petitioner at trial. The petitioner was out on bond for most of the time while his case was pending, so he and the petitioner met several times to discuss the case. Counsel thought that he and the petitioner had an excellent relationship and communicated well. Counsel said that he received discovery, which included the petitioner's confession, and he reviewed the discovery with the petitioner. However, he could not recall whether he prepared a copy of the discovery to give to the petitioner.

Counsel testified that he and the petitioner discussed trial strategy. Their primary consideration was that the petitioner had given a detailed, Mirandized statement about twenty-four to thirty-six hours after the murder. In the statement, the petitioner said that the victim was threatening to tell the petitioner's wife about his and the victim's affair, and the two of them argued. "[A]t one point[,] things seemed to cool then they heat up again and [the petitioner] fired some shots" while the victim was sitting inside her car. Counsel recalled that, at trial, the petitioner testified that the victim appeared to be trying to run him over, although those details were not in his statement.

Counsel testified that, after meeting with the petitioner and reviewing the

11

discovery, he and the petitioner decided to raise self-defense as their theory of defense. In addition to the orders of protection that had been filed against the victim by Ms. Johnican and Mr. Beach, counsel learned that the victim had been convicted of aggravated assault which was a Class C felony involving violence. Their strategy was to show that the victim was "an extortionist, a liar and that she was aggressive." The defense had no problem entering proof of the victim's aggravated assault conviction. However, the State objected to the orders of protection. The court ruled that it would hear from Ms. Johnican and Mr. Beach directly about the underlying facts of the orders of protection but would not let the orders themselves be entered into evidence.

Counsel testified that he did not recall whether he was able to obtain an address to subpoena Ms. Johnican and Mr. Beach. After the court's ruling, he and the petitioner discussed the issue. He explained to the petitioner that the victim's felony conviction had already been admitted into evidence and, even if they could find the witnesses and put them on the stand, he was not sure how well the jury would receive the testimony. Counsel thought it would have been an unnecessary risk to have them testify because the victim's felony conviction allowed him to argue that the victim had a propensity for violence. Counsel did not recall the petitioner's insisting that the two witnesses testify, but he would have complied had the petitioner done so. However, he would have advised the petitioner against it and, based upon their communication and relationship at the time, counsel felt that the petitioner would have probably taken his advice against calling the two witnesses.

On cross-examination, counsel testified that the petitioner's statement to the police "was a significantly limiting factor," and the statement did not definitively establish self-defense. The petitioner's statement also established a motive for the petitioner's having committed the charged offense of first-degree murder because the victim was trying to extort money from him and tell the petitioner's wife that she was pregnant. Counsel believed that the petitioner was "brutally candid, cooperative, and honest" when he was questioned by the police, and counsel did not feel there were any grounds to suppress the statement.

Counsel recalled having difficulty in locating Ms. Johnican and Mr. Beach. He expressed fear in presenting them as witnesses because doing so could potentially draw backlash from the jury for degrading a victim too much. He strategically decided that Ms. Johnican and Mr. Beach could not contribute anything to the case that was not already before the jury.

Michael Beach testified that he is a correction officer at the Shelby County Correction Center. He and the victim dated for about six years and had a child together. He recalled that his and the victim's relationship was "terrible at the end because me and

12

her broke up and she pretty much got me arrested and was harassing me on my job," leading him to file for an order of protection. He elaborated that the victim had him arrested because she went to the hospital and said that he had struck her with keys. He turned himself in after charges were filed against him, but the case was ultimately dismissed. Mr. Beach felt threatened by the victim's behavior. The order of protection was granted when the victim failed to appear for the hearing.

Mr. Beach testified that he was in a relationship with the victim from 2002-2008, and he began dating Ms. Johnican a few months after he and the victim broke up. The victim was angry that Mr. Beach had started dating someone else, and Mr. Beach had to request a police escort to assist him in removing his belongings from the victim's residence.

Ida Johnican, a correction officer at the Shelby County Penal Farm, testified that she and Mr. Beach had dated for six years. Ms. Johnican did not know the victim, but the two of them had some interaction after Ms. Johnican started dating Mr. Beach. Ms. Johnican recalled that the victim called her at work and threatened to kill her because of Mr. Beach. Ms. Johnican told her supervisor and filed an incident report. When Ms. Johnican left work, the victim followed her and used her vehicle to hit Ms. Johnican's truck on the driver's side. Both of the women called the police and accused the other woman of hitting her car. Ms. Johnican did not hear from the victim again but, after seeing camera footage from her work's parking lot showing the victim waiting in the lot, Ms. Johnican felt threatened and sought an order of protection.

Ms. Johnican recalled speaking with counsel one day during the trial. Counsel asked her what had happened between her and the victim and asked her to come to the courthouse to testify. However, she was not under subpoena and had other plans that day, so she did not go. On cross-examination, Ms. Johnican admitted that part of the reason she did not go to testify was because she did not want to get involved, but on redirect, clarified that she would have appeared in court had she been given advance notice and been subpoenaed.

After the hearing, the post-conviction court entered an order denying relief. The court found that counsel made a tactical decision to not have Ms. Johnican testify and that the petitioner had failed to show that counsel's tactical decision "fell below an objective standard of reasonableness and outside the wide range of reasonable professional assistance considering all the facts and circumstances" of the case. The court additionally found that there was "no 'reasonable probability' the additional testimony of Ms. Johnican would have altered the outcome of the case."

## ANALYSIS

On appeal, the petitioner argues that he received ineffective assistance of counsel because counsel failed to call Ida Johnican to testify at trial, and her testimony would have "presented [the victim] as a dangerously aggressive woman who had previously used her vehicle to strike out at those that had angered her."

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness

14

under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We initially determine that the petitioner failed to prove that counsel's decision to not subpoena Ms. Johnican to testify at trial constituted deficient performance. Counsel testified that he was afraid of presenting Ms. Johnican as a witness because doing so could potentially draw backlash from the jury for degrading the victim too much, and he strategically decided that Ms. Johnican could not contribute anything to the case that was not already before the jury. In addition, the petitioner has failed to establish prejudice. The post-conviction court's detailed findings regarding prejudice are exactly on-point regarding this issue:

> [The] [p]etitioner has failed to establish "prejudice." Under the particular facts and circumstances of the present case there is no "reasonable probability" the additional testimony of Ms. Johnican would have altered the outcome of the case. The [p]etitioner was a Memphis police officer. He was trained in the law and a member of the criminal justice system. In addition, he was trained to exercise a higher degree of restraint than the average citizen when confronted with conflict. . . . Against this back drop, the facts of the present case show that the [p]etitioner had a motive to kill the victim. He acknowledged that the victim had threatened to blackmail him and tell his wife of their affair and resulting pregnancy. He also failed to report the incident, attempted to cover it up and dispose of evidence and initially denied any knowledge of it when confronted by his superiors. The [p]etitioner also admitted shooting the victim through a side passenger window which indicates that he was in a position of safety at the time he shot the victim. In addition, [the] [p]etitioner shot the victim three times

15

with exceptional accuracy, once in the head and twice in the chest, although he claimed he was not aiming and was attempting to avoid being run over by the victim.  Finally, [the] [p]etitioner's claim of self-defense was not mentioned in [the] [p]etitioner's formal signed statement and denied by all the officers who spoke with [the] [p]etitioner at the time.  Thus, [the] [p]etitioner asked the jury to believe that a Memphis police officer, trained in the law, would sign a formal confession to killing the victim that made no mention of his claim of self-defense.  No matter how violent the background of the victim, in this case the [p]etitioner's version of the events claiming self-defense for the first time at trial seems incredible.  No matter what the victim's propensity for violence, [the] [p]etitioner still had a (1) a motive to kill her, (2) covered it up and destroyed evidence, (3) initially denied any knowledge of it, (4) shot the victim three times with incredible accuracy, (5) from an apparent position of safety and (6) signed a formal statement that made no reference to "self-defense."  Nevertheless, trial counsel did get into evidence the victim's conviction for aggravated assault, establishing her propensity for violence, as well as proof that she was a liar and a blackmailer.  There is no "reasonable probability" that evidence of the additional incident of the victim ramming a car into another car would not [sic] have altered the outcome of the case.  Trial counsel did well to get the jury to return a verdict on the lesser-included offense of second degree murder.  [The] [p]etitioner has failed to establish "prejudice."

We conclude that, in light of this proof as succinctly recalled by the post-conviction court, there is no reasonable probability that Ms. Johnican's testimony would have changed the outcome of the proceeding.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

16